UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| Baker et al | No. 5:23-cv-04022-TC-TJJ |
|---|---|
| Plaintiffs, | PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION & |
| v. | MEMORANDUM OF LAW IN SUPPORT |
| Watson et al | OF MOTION FOR PRELIMINARY |
| Defendants | INJUNCTION |

**LEGAL STANDARD**

To establish irreparable harm, "a plaintiff must demonstrate a significant risk that [it] will experience harm that cannot be compensated after the fact by money damages." *Fish v. Kobach*, 840 F.3d 710, 751-52 (10th Cir. 2016). Where there is a "conflict between the Free Exercise Clause and the application of" state laws that prohibit benefits for religious private schools, this Court must "disregard[]" the state laws and "decide[] this case conformably to the [C]onstitution of the United States," which "condemns discrimination against religious schools and the families whose children attend them." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2262-63 (2020).

**ARGUMENT**

I. **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS**

Nothing in the Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 or the U.S. Constitution require that special education services be provided in a "secular and nonideological manner" (K.A.R. 91-40-48(c)(2)) or that they cannot be provided "in connection with religious courses, devotional exercises, religious training, or any other religious activity." K.S.A. 72-3463. In conjunction with that religious targeting, nothing in the IDEA requires Kansas to impose a singular duty upon a parent of an exceptional child "to require such child to attend school to receive the special

1

education and related services which are indicated on the child's IEP or to provide for such services privately." K.S.A. 72-3421. If the child does not attend school or the special services are not provided, the parents and students are subject to Kansas Child in Need of Care proceedings and criminal sanctions for truancy. K.S.A. 72-1113; Kansas Attorney General Opinion 2000-16. Together with the compulsory exceptional children school attendance requirements, the entirety of the statutory and regulatory framework levy the consumption of several anti-religious and anti-speech poison pills corrupting the sum of this scheme in violation of the First Amendment.

This scheme violate Plaintiffs' First Amendment rights in nine different ways: **(1)** by targeting religion in violation of the Free Exercise Clause (*Lukumi*); **(2)** by denying access to an otherwise available public benefit program in violation of the Free Exercise Clause (*Carson*); **(3)** by categorically exempting certain secular schools from the burdens imposed on religious schools (*Tandon*); **(4)** by infringing on the rights of parents to direct the religious education of their children in violation of the Free Exercise Clause (*Yoder*); **(5)** by coercing speech on religious matters in violation of the Free Speech Clause (*Hurley*); **(6)** by interfering with Plaintiffs' right of expressive association in violation of the Free Speech Clause (*Roberts*); **(7)** by causing entanglement of church and state in violation of the Establishment Clause (*Carson*); **(8)** by interfering with the operation of religious schools in violation of church autonomy principles (*Our Lady of Guadalupe*); and **(9)** by imposing unconstitutional

conditions in violation of the First Amendment (*AOSI*). Any one of these violations would justify a preliminary injunction; Plaintiffs are likely to succeed on each.

A. FRAMEWORK VIOLATES THE FREE EXERCISE CLAUSE BY TARGETING RELIGION.

Kansas' rules are facially offensive to the Constitution. Putting that aside, in *Lukumi*, the Supreme Court struck down a set of city ordinances that were neutral on their face but had the "impermissible object" of singling out the disfavored religious practice of animal sacrifice. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 524, 534 (1993) (holding that the "ordinances may be treated as a group for neutrality purposes"). *Id.* at 540. *Lukumi* analyzed their practical impact because "the effect of a law in its real operation is strong evidence of its object." *Id.* at 535. *Lukumi* concluded that the laws were not neutral, since in practice they acted as "religious gerrymanders." *Id.* at 534. Analyzed as a whole, so too here. None of the framework is accidental. Evidence of a law's lack of neutrality can come from its "historical background," the "series of events" spurring its enactment, and "contemporaneous statements" made by lawmakers. *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n,* 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 540). This framework is an offspring of the Blaine provision in Article 6, Section 6 of the Kansas Constitution. *See* Sondergard, M. (2018). BLAINES BEWARE: TRINITY LUTHERAN AND THE CHANGING LANDSCAPE OF STATE NO-FUNDING PROVISIONS. The University of Kansas law Review, 66(4), 753-785; *Wright v. School Dist. No. 27 of Woodson Cty.*, 99 P.2d 737, 738 (Kan. 1940). The Attorney General's inconsistent (and outdated) opinions reflect these systemic anti-religious viewpoints despite Kansas providing school choice.[1] The 2000-32 opinion stated that even though the public funding was

---

[1] KAN. ATT'Y GEN. OP. NO. 94-37 (1994), HTTP://KSAG.WASHBURNLAW.EDU/OPINIONS/1994/1994-037.HTM;

3

flowing to the schools indirectly by way of the parents' choices, it still had the prohibited effect of public money going to religious schools. The 2004-5 opinion theorized that Kansas's framework did not prevent governmental aid to religious schools as long as the aid was for the students. The A.G. noted that the legislative history of the 1966 Constitutional amendment states that the no-funding provision would not "prohibit the appropriation of public funds to indirectly benefit private institutions." *Id.* (quoting KAN. LEGIS. COUNCIL, THE EDUCATION AMENDMENT TO THE KANSAS CONSTITUTION, Pub. No. 256, at 36 (Dec. 1965)). Here, Kansas' words and deeds raise more than "slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices." *Masterpiece Cakeshop* at 1731. The historical background of Kansas discrimination against religion, religious private schools, collection of its statutes and regulations to exclude religious private schools from the benefits of its special needs program by attaching religiously unacceptable conditions on their participation all demonstrate religious targeting.

**B. KANSAS' RULES VIOLATE THE FREE EXERCISE CLAUSE BY IMPOSING THE SAME EXCLUSION FROM A PUBLIC BENEFITS PROGRAM INVALIDATED IN *CARSON***

Under the Free Exercise Clause, Kansas may not exclude private sectarian schools from its special needs benefits program because they are religious or do religious things. *Carson v. Makin,* 142 S. Ct. 1987, 1997-98 (2002). The Supreme Court has thrice held that a state "violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, at 1996; *see also Trinity Lutheran v. Comer*, 582 U.S. 449 (2017); *Espinoza*, 140 S. Ct. at 2262.

---

KAN. ATT'Y GEN. OP. NO. 2000-32 (2000), HTTP://KSAG.WASHBURNLAW.EDU/OPINIONS/2000/2000-032.HTM;KAN.ATT'YGEN.OP.NO.2004-5(2004), HTTP://KSAG.WASHBURNLAW.EDU/OPINIONS/2004/2004-005.HTM.

Moreover, "condition[ing] the availability of benefits" on a school's lack of religious character "'effectively penalizes the free exercise' of religion" and violates the First Amendment. *Carson*, at 1997-98.

Under K.A.R. 91-40-48(e) an "agency" can offer classes that are organized by the "religion of the student" yet cannot if the class could include both public and private school students. That discriminates against special needs students because they must remain enrolled in the public school system in order for the parents to obtain FAPE even if sent to a private school. K.A.R. 91-40-48(c)(2)) and K.S.A. 72-3463 are religious expression prohibitions. Kansas continues to exclude religious private schools from the complete benefits of its special needs program today. The compulsory school requirements imposed upon each parent regarding their exceptional needs child, together with the parallel duty to ensure the special needs services must be provided in the manner dictated by K.A.R. 91-40-48(c)(2)) and K.S.A. 72-3463, these provisions work in tandem to prevent religious parents and schools from maintaining their respective religious identity if they want to qualify to receive FAPE. In fact, it forces parents to altogether forfeit their religious identities when providing the services at their own expenses because of the ongoing unconstitutional conditions imposed upon the delivery of those services Religious institutions like Heritage House and Baumgarten Academy are therefore excluded unless and until they forfeit their religious character. By enacting these two provisions, Kansas has effectively enacted the same comprehensive exclusionary scheme that the Supreme Court struck down in *Carson*.

The teacher control and the religious sterilizing conditions of K.A.R. 91-40-48 and K.S.A. 72-3463 make the receipt of free special education benefits – as well as the delivery of those services at the parent's own expense – conditional on the abandonment of religious identity, effectively disqualifying both parents and these homeschools "solely because they are religious." *Espinoza*, 140 S. Ct. at 2261. "That is discrimination against religion." *Carson*, 142 S. Ct. at 1998.

**C. KANSAS' REGULATORY AND STATUTORY FRAMEWORK VIOLATE THE FREE EXERCISE CLAUSE BECAUSE THEY ARE NOT GENERALLY APPLICABLE**

A law is not generally applicable if it treats "any comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021); see also *Fulton*, 141 S. Ct. at 1877 ("A law … lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way"). Special needs services are designed to be utilized in the general education curriculum." 34 C.F.R. § 300.320(a)(2)(i).[2] Public and nonsectarian schools obtain the full benefits. However, sectarian schools which have a different general education curriculum including all of the things K.S.A. 72-3463 prohibits do not. Thus religious parents and sectarian schools are not able to obtain those benefits during – actually "in connection with" – that general education curriculum. Kansas' rules are a religious gerrymander with categorical exclusions of: (1) a free special needs services in a sectarian general educational curriculum; and (2) providing those special needs services "privately" at

---

[2] See K.S.A. 72-3429(c)(2) ("make progress in the general education or advanced curriculum").

6

the parent's expense at any private school. This renders those rules "underinclusive" because "[t]hey fail to prohibit nonreligious conduct that endangers [the State's nondiscrimination] interests in a similar or greater degree than" religious schools purportedly do. *Lukumi*, 508 U.S. at 543. Kansas must therefore meet strict scrutiny, *Tandon*, 141 S. Ct. at 1296, which it cannot.

### D. KANSAS' RULES VIOLATE THE FREE EXERCISE CLAUSE BY INFRINGING ON THE RIGHTS OF PARENTS TO DIRECT THE RELIGIOUS EDUCATION OF THEIR CHILDREN

Kansas' framework also impinge on "the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). "[T]he traditional interest of parents with respect to the religious upbringing of their children" is a "fundamental right[] and interest[]" and is "specifically protected by the Free Exercise Clause of the First Amendment." *Id.* at 214. It is also "perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Incursions on this fundamental right trigger strict scrutiny. *Yoder*, 406 U.S. at 214; *Employment Division v. Smith*, 494 U.S. 872, 881 (1990) (citing *Yoder*, 406 U.S. 205).

Baker and Baumgarten, like many other religious parents, strive to raise their children according to their shared Christian faith. But Kansas' rules have interfered and continue to interfere with their ability and right to do so. Were it not for Kansas' religious activity exclusions, they could have received FAPE or obtained special needs services at a private sectarian school while preserving their religious identity. These plaintiff private homeschools – or any sectarian private school each plaintiff parent

7

elected – could have received the benefits of the preferred "push-in" services" described in the Amended Complaint. Doc. 13, ¶¶86-90.  K.A.R. 91-40-48 specifically controls who and how special education services are provided.  It constrains services to be provided outside the public school context in a "secular and nonideological manner" along with these additional restrictions at (b)(1)-(2):

(1) The employee performs the services outside of the employee's regular hours of duty.
(2) The employee performs the services under public supervision and control.

As a group of regulations, these provisions eviscerate parental control and school choice.  Even though Kansas provides for school choice allowing some parents to educate their child with their own chosen teachers, these provisions do not permit this which subjects the plaintiffs disparate and unequal treatment.  These provisions do not allow a parent to control the education or to educate her own exceptional child as other homeschoolers.  As to other private sectarian schools, the parent may not receive the benefit of her chosen religious teacher – in fact the parent is not permitted to provide any of the special needs services herself.  Instead, she must use a teacher controlled by the government. And then under the vague provision that the services be provided "outside regular hours." Thus this regulation specifically prohibits the push in delivery of special needs services during any general educational curriculum whether religiously sterile or not.  By conditioning the use of otherwise generally available funding for religious schools on those parents and schools abandoning core elements of what makes them religious in the first place, Kansas has interfered with

8

Terri Baker's and CarrieAnn Baumgarten's right to direct the religious upbringing of their children. *Yoder*, 406 U.S. at 235.

### E. KANSAS' RULES VIOLATES THE FREE SPEECH CLAUSE BECAUSE IT COMPELS SPEECH BY PARENTS AND RELIGIOUS SCHOOLS

K.S.A. 72-3463, K.A.R. 91-40-48(c)(2), and together with K.S.A. 72-3421's private duty imposition upon each parent, independently violates Plaintiffs' rights under the Free Speech Clause by forcing them to allow speech that they disagree with during their sectarian general education curriculum. It requires plaintiffs to endorse a secular ideology. These religious expression provisions ban speech, and then distorts speech to require the plaintiffs to express viewpoints with which they do not agree. *Cressman v. Thompson*, 798 F.3d 938, 950 (10th Cir. 2015). But Kansas cannot "compel [a] speaker to alter [its] message by including one more acceptable to others." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston,* 515 U.S. 557, 581 (1995); *see also W. Va. Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943).

In *Hurley*, the Supreme Court unanimously held that the First Amendment protected the right of a private parade organizer to exclude a group from participating in the parade because of the message that the group sought to convey. *Hurley* at 570, 574. "Since every participating unit affects the message conveyed by the private organizers," forcing the parade organizers to include an unwanted unit would "alter the expressive content of their parade." *Id.* at 572-73. The Court held that this would violate "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573.

9

Kansas' rules violate the parent's and the school's right to "choose the content of [its] own message." *Hurley*, 515 U.S. at 573.

## F. KANSAS' RULES VIOLATE THE FREE SPEECH CLAUSE RIGHT OF EXPRESSIVE ASSOCIATION

The religious activity and expression provision also interferes with the Plaintiffs' expressive association rights. Parents must associate themselves at all times with a government controlled employee to teach their child. As to messaging, the First Amendment protects the rights of individuals, as well as institutions, to "associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, … and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984). "Religious groups" like these parents and their homeschools "are the archetype of associations formed for expressive purposes." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,* 565 U.S. 171, 200 (2012) (Alito, J., joined by Kagan, J., concurring). The First Amendment protects the right to direct the education of a child and by extension the right to associate with others of their choosing to accomplish that purpose. *See Yoder*, 406 U.S. at 232; *see also Mahanoy Area Sch. Dist. v. B.L.,* 141 S. Ct. 2038, 2053 (2021) (Alito, J., joined by Gorsuch, N., concurring) ("In our society, parents, not the State, have the primary authority and duty to raise, educate, and form the character of their children").

These homeschools were formed to partner with these plaintiff parents in educating their children according to their Christian faith. To accomplish that purpose, these homeschools must be free to express its particular Christian message during its general education curriculum without intervention by the state. But

10

Kansas is now conditioning the receipt of special needs services on the forfeiture of a school's ability to control the religious messages conveyed on its own campus by its own teachers. In doing so, Kansas interferes with the ability of these homeschools and Kansas Christian families to join together to impart Christian teachings to the next generation utilizing their own teachers. That intrusion violates the First Amendment.

### G. KANSAS' RULES VIOLATE THE ESTABLISHMENT CLAUSE BECAUSE THEY INVITE EXCESSIVE ENTANGLEMENT UNDER *CARSON*

*Carson* also explained that "scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion and denominational favoritism," both of which violate the Establishment Clause. *Carson* at 2001 (citing *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2064 (2020); *Larson v. Valente*, 456 U.S. 228, 244 (1982)). But Kansas' collective rules mandating government controlled teachers and its religiously sterile requirements do just that: they reach into the heart of religious schools and give schools (empowered by the KSDE regulation) – not parents and the religious schools they partner with—the authority to say how the schools should be run. To define what meets when a general educational curriculum is encompassed in the religious criteria of K.S.A. 72-3463 and K.A.R. 91-40-48(c)(2) is precisely that kind of prohibited entanglement. Doc. 13, ¶27. This scheme creates excessive entanglement between the state of Kansas and religious parents and schools—an entanglement that inevitably invites Kansas officials to condone the actions of religious schools who have beliefs the government agrees with and sanction those who do not. Further, "[i]t is not only the conclusions that may be reached by the

[Commission] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979). As *Carson* recognized, this kind of government interference in the internal policies of religious organizations is anathema to our constitutional order. 142 S. Ct. at 2001.

**H. KANSAS' RULES VIOLATE THE FIRST AMENDMENT RIGHT OF RELIGIOUS AUTONOMY**

Kansas' rules violate the right of religious autonomy as well. Religious autonomy, which arises from the nexus of the Free Exercise and Establishment clauses, was what *Carson* had in mind when it reminded Maine that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* (citing *Our Lady*, at 2064, and *Hosanna-Tabor*, 565 U.S. at 192). The right to select who will carry out these important functions is at the heart of religious autonomy. For that reason, cases like *Hosanna-Tabor* and *Our Lady* have held that teachers at these homeschools and other private sectarian schools who are responsible for imparting the faith to the next generation are "ministers" whose employment is exempt from state and federal employment discrimination law. *Our Lady*, 140 S. Ct. at 2064. Likewise, religious schools have the constitutional right – long protected in Kansas and Federal employment law – to hire non-ministerial staff that support their religious mission in word and deed. *See, e.g., Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 329 (1987) (construing Section 702 of Title VII of the Civil Rights Act of 1964 to allow a church-owned gym to discharge a janitor for failing to conform to the church's teachings in his personal life); *Bryce v. Episcopal Church*,

12

289 F.3d 648, 660 (10th Cir. 2002) (recognizing religious autonomy right to make "personnel decision[s] based on religious doctrine"). Kansas has made it clear that it does not defer to the religious autonomy of religious schools in its special needs program: it strips parents and religious private schools of their hiring rights and to enjoy a religious general educational curriculum which violate religious autonomy.

**I. KANSAS' RULES IMPOSE UNCONSTITUTIONAL CONDITIONS ON THE PROGRAM**

At a basic level, Kansas' regulatory efforts to control the internal operations of religious schools run headlong into the doctrine of unconstitutional conditions.[3] A "State may not deny a benefit to a person on a basis that infringes his constitutionally protected … freedom … even if he has no entitlement to that benefit." *Mahanoy*, 141 S. Ct. at 2053-54 (quoting *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013)) (AOSI). Under this doctrine, the government may not "go[] beyond defining the limits of the [government] funded program to defining the recipient" by seeking to control the internal policies of the recipient itself. *AOSI,* 570 U.S. at 218.  Thus, in *AOSI*, the federal government could require grant recipients to use federal money to promote the government's anti-AIDS message and to oppose legalized prostitution – but it could not require grantees to adopt the government's policies opposing legalized prostitution as their own. *Id*. at 220-21.

Kansas' framework runs afoul of *AOSI*.  Kansas has decided to expand special needs services and provide school choice that parents may direct. Kansas' rules coerces parents and religious schools to stop being religious.  This it cannot do.

---

[3] This is not new. In *Carson*, the First Circuit recognized that *Trinity Lutheran* and *Espinoza* "resonate[] with unconstitutional conditions doctrine in the First Amendment area more generally." *Carson*, 979 F.3d at 34 n.1.

13

Kansas' "administration of that benefit is subject to the [First Amendment] principles governing any such public benefit program" which means, among other things, that it "cannot disqualify some private schools solely because they are religious." *Carson*, 142 S. Ct. at 2000.

## J. KANSAS' RULES CANNOT SATISFY STRICT SCRUTINY

Not all of Plaintiffs' claims require a strict scrutiny analysis.[4] But for those that do, Kansas' rules fail because they are not narrowly tailored to serve a compelling government interest. "A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. Kansas purports to assert a compelling interest in not establishing religion. But as "explained in both *Trinity Lutheran* and *Espinoza*, such an interest in separating church and state more fiercely than the Federal Constitution cannot qualify as compelling in the face of the infringement of free exercise." *Carson*, 142 S. Ct. at 1998.

## II. THE REMAINING INJUNCTION FACTORS FAVOR THE PLAINTIFFS

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). That injury is compounded where, as here, Kansas

---

[4] Where government targets religious exercise, attempts to interfere with church autonomy, or becomes entangled in religious affairs, a court must "'set aside' such policies without further inquiry" and without the need for a strict scrutiny analysis. *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 n.1 (2022) (religious targeting); *see also Our Lady*, 140 S. Ct. at 2060 (church autonomy/entanglement).

has singled out religious schools and families for exclusionary treatment. Plaintiffs are therefore suffering and will continue to suffer irreparable harm due to the ongoing violation of their First Amendment rights. In addition to depriving Plaintiffs of their constitutional rights, these plaintiffs will be irreparably harmed by the loss of educational opportunities for the plaintiffs' students. The balance of the equities and public interest also favor Plaintiffs. Where the government is the defendant, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Public interest favors plaintiffs' assertion of their First Amendment rights. *See Elam Constr., Inc. v. Regional Transp. Dist.*, 129 F.3d 1343, 1347 (10th Cir.1997). Defendants will suffer no damages by enjoining these provisions. Fed. R. Civ. P. 65(c). The relevant "amount" required to preserve Defendants' interests is thus zero.

## CONCLUSION

The Court should grant a preliminary injunction barring each defendant from enforcing:

- K.S.A. 72-3463; and
- K.A.R. 91-40-48(b),(c), & (e).

/s/Linus L. Baker KS 18197
6732 West 185th Terrace
Stilwell, Kansas 66085
Telephone:     913.486.3913
Fax:               913.232.8734
Email: linusbaker@prodigy.net
Attorney for the plaintiffs

**CERTIFICATE OF SERVICE**

On this 19th day of June, 2023, the above document was filed with the Court's CM-ECF system which will provide notice to all counsel of record.
/s/Linus L. Baker
Linus L. Baker